We'll hear from Mr. Whipburn. May it please the court, the United States Supreme Court, Andrew F. v. Douglas County School District, R.E., that to meet its substantive obligations under the Individuals with Disabilities Education Act, a school must offer an individualized education program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances. The Supreme Court made clear that in developing a program for a child, the school district must understand and take stock of the circumstances and characteristics unique to that child. Highland Park Independent School District failed to do that for years for plaintiff here, and he suffered dramatically as a result and would continue to do so if he had not been privately placed. Both the administrative hearing officer below and the district court below were stymied by the factual complexity of the record and by Highland Park Independent School District's mischaracterizations of the data, but in allowing themselves to focus on those misleading characterizations of the data, they missed the force of the expert testimony that alone would explain what the unique characteristics and circumstances of plaintiff actually are. And the problem with that is that if you don't understand what the unique characteristics and circumstances of plaintiff actually are, you lack the tools to analyze the data that you're trying to review in the record. What are the precise deficiencies in any of the IEPs that you're referring to? The difficulties with the individualized education program is that there are several. First, they're based on data that is completely unreliable. But let me just say, I mean, you're not making a procedural attack on those, are you? In other words, the parents were consulted, notified, involved, and I think the rule is you have to sign off on those IEPs, don't you? The parents disagreed with the individualized education program. But they never put anything in writing about that or requested a due process hearing? This hearing today is, this argument today is a result of a due process hearing. Well, I understand that after he was in the school district for several years. That's correct. And in terms of the, if Your Honor is referring to the statute of limitations argument with respect to... Well, that's part, yes. Okay. So the statute of limitations argument is largely about what effect did the injuries of a plaintiff have on his career at Highland Park Independent School District. He had five injuries over the course of his tenure there. Every time he had an injury, the school district would indicate, well, okay, we understand. We've got it taken care of. We won't let it happen again. And we'll take the procedures necessary to make that stop. The parents believe them because they're not litigious. They're not trying to file a due process claim if the school district is representing that it can make the situation better. Now, the school district itself in May of 2012 recognized that Plaintiff himself was susceptible to these kinds of injuries, that in fact, even sitting on the floor himself, that he would be prone to have an injury, that he would be prone to fall over. Now, the expert testimony in this case, which, of course, wasn't available in May of 2012, but it was available for the hearing officer and the district court to review it for purposes of this case, indicates that when you have that kind of a situation, there are dramatic effects on the child with the disability, specifically with this sort of disability, a child that does not have protective reflexes, a child with cortical visual impairment who doesn't have any kind of ability to protect himself when he falls is going to suffer a tremendous trauma in each of those kinds of events. And the reason for that is not necessarily because of the specific injury suffered in terms of a bruising on the face, in terms of a black eye or whatnot. That's not the extent of it. The extent of it is that when you have a child who's falling over and hurting himself that way has absolutely no way to protect himself under those circumstances, whether it's being a changing table, if it's off a K-bench, if he's falling over in an iPad, all of these things happen in this case, then that child is experiencing a complete helplessness, a no ability to protect himself. And according to the expert testimony, that child is going to suffer stresses that will stay with him. Well, I'm not, I certainly would not detract from the seriousness of the situation, but it did appear to me that each injury came, except for two of them, four of them happened under completely different circumstances. In other words, one of them on the changing table, one of them falling out of a rolling chair, two of them on this special bench. So each one was a case where there might have been an attendant, and in fact they assigned extra attendants, but triggering limit or extending limitations because of specific things is a difficult concept for me. I don't think that this case, and I think there's several issues here, so I'll try to address each one of them. I don't think this case hinges on extending the statute of limitations in any event, because I think what we're dealing with here, it's not like a personal injury case where there are damages claims based on each of these incidents, at least not with respect to the individual with disabilities. Well, you argued it, so okay, if it's, I mean, then you can move on if that's not a... But I think it's helpful to... I don't think they're irrelevant, factually. They're not irrelevant, but I think that the primary issue for proving up the individual's disability education claim is whether there's a reasonable likelihood that the plaintiff is going to have these kinds of injuries going forward and is going to have a detraction to his ability to receive an appropriate education from the school district going forward. Now, the primary relevance of the past injuries, then, is the fact that they build up a history. They build up a history as showing that Highland Park Independent School District, even though they knew in May of 2012 that this child was particularly susceptible to injuries and would suffer from them, over and over again, he's getting injured. He's getting injured in the school district's care. Dr. Van Dyck, the expert in this case, specifically testified, and this is at Record on Appeal 6134 to 6135, that any individuals working with the plaintiff have to recognize the particular vulnerabilities associated with his disabilities and should protect him day and night from falls and related injuries. Now, it is true, Your Honor, as you point out, that there are differences in the particular circumstances that go along with each one of these injuries. In one case, he fell off a changing table. In one case, he fell off a K-bench. But in each circumstance, and even the hearing officer recognized this, that in each circumstance, these injuries were easily preventable, that they may have even, in the hearing officer's words, come close to negligence. Now, why would you do that? Why would you sit an individual like a plaintiff in a circumstance where you're walking away, whether you've got one person there and they're walking away, you've got two persons there but they're not within arm's length in an unstrapped changing table, for example, or a defective chair, whatever the particular circumstances are, you have to, in this case, if you understand the unique circumstances of this disabled child, you have to make sure that that child is not going to fall out of the chair. Well, you mentioned the Andrew case, and I agree that's controlling, as this court has applied four factors, and those are, number one, whether the plan was individualized. It was. Whether the plan was administered in the least restrictive environment. It was. Whether services were provided in a coordinated and collaborative manner. Do you disagree with that? Do I disagree whether it was? Whether the services were provided in a coordinated and collaborative manner by the key stakeholders. Yes, plaintiff disagrees with that. You disagree with that one? And then you disagree whether the plan produced academic and non-academic benefits. That's correct, Your Honor. Okay. Well, why don't you, can you put it a little more concretely in terms of those two factors? In terms of the last two factors? I think, well, whatever factors you're disagreeing with. So, we disagree with all four, because with respect to the individualized, the point of the first requirement under Michael F. or Michael Z., whichever case you want to look at, the point of that first requirement is whether the school district takes seriously and implements the evaluation data it has. Now, the first evaluation data that the school district itself had was in May of 2012. In May of 2012, the district already understood that, for example, the plaintiff had the susceptibility to injuries, and yet the school district didn't take the measures necessary to implement that and make sure that he didn't get injured. In the May of 2012, in that first evaluation, the Highland Park School District noted that plaintiff will point to pictures when they are presented to him on a black felt board in a field of two or four. He will consistently and accurately identify a picture of one of his reinforcing items when the other choices are non-reinforcing. He was already doing that in May of 2012, and yet in October of 2014 and in May of 2015, they're trying to present him with these same goals, and they're trying to understand why he's not doing these things without taking seriously the fact that he's regressed by their own evaluation data from May of 2012. They're not taking that seriously. They're not looking at the actual evaluations they did and tracing his history throughout the time period. Without that, it doesn't help to have evaluations. You can't say that your program is individualized on the basis of your evaluation data when you're not even paying attention to your own data. Now, this is a problem that the hearing officer in the district court below had as well, because they paid no attention to Highland Park Independent School District's May of 2012 evaluation data either in determining how plaintiff had done over the course of those years. Well, does it inevitably follow that every special needs student is going to progress? It doesn't necessarily follow, but I think this is the point of Andrew F. In order to determine whether the plaintiff or whether the individual with disabilities is progressing, you have to understand the basic characteristics of that individual. And in this case, the Highland Park Independent School District didn't only misunderstand in terms of the injuries. They didn't only miss the point with respect to his susceptibility to injuries and his vulnerability to stress improvement. They also misunderstood who they were dealing with with respect to at least two other factors, which is, one, his delayed processing. Another thing that was mentioned in the May 2012 full individual evaluation, it said all the way along that he had delayed processing, and yet in May of 2015, the district comes up with another evaluation that says, oh, wow, he's got delayed processing. And their assistive technology expert said, wow, this was a huge deal to us, because now we recognize that when we were trying to accumulate data from him before, sometimes he wasn't finished processing and he might have continued to give us the right answer, but we didn't know that, so we didn't get the data right. Well, they should have known that, because it was in their May 2012 full individual evaluation. And the Texas School for the Blind and Visually Impaired had constantly told them, he's got delayed processing. Don't rush him. Don't move him through these activities. Why is it that at the end, in May of 2015, this is such a stunning recognition for them? Well, it's because they didn't, several things. One, they didn't use their own evaluation data properly. Two, they didn't coordinate and collaborate with the key stakeholders, because the parents could have told them that all the way along. When you don't know what you're looking at, who are you going to trust? Who are you going to go to to evaluate what's going on with this child? Well, the people who have known him all the way along, the parents. The parents try to tell him, he's regressing, he's regressing. The parents try to tell him, he knows a lot more than you're giving him credit for. That's the key point with respect to the coordinating collaborative stakeholders. It's not how much time you sit with them in admission review and dismissal meetings. It's do you give them a fair chance to explain what they're actually trying to say, or do you just stay wedded to your own preconceptions of what your data is showing when you actually don't know what the data is indicating at all? The fourth element where the school district didn't understand what they were dealing with is, and I think this weighs into the least restrictive environment issue, and that is that they didn't understand when plaintiff was stressed out or when he was happy or what he was doing with respect to his behaviors. One of the things that became clear in the course of the due process hearing in the administrative record is that plaintiff is somebody who expresses his stress levels a lot by, for example, I'll get to the rest of it at rebuttal. Thank you. All right. Thank you. May it please the court, my name is Meredith Walker and I'm here on behalf of Highland Park Independent School District. At the core, this case is about the safety of a student and whether five minor injuries occurring over the span of two years can deprive a child of a free appropriate public education or a FAPE. Highland Park ISD maintains that it does not because the Michael F factors show RS received a FAPE despite the minor injuries. When you overlay the Michael F factors over RS's disabilities, you show that his IEP, his individualized education program, was individualized to his unique needs. He received his services in the least restrictive environment. The communications and efforts by the district to involve RS's parents as well as his outside providers is the epitome of collaboration and is exactly what this court is looking for when it evaluates that factor. But most importantly, RS benefited from his IEP. Even though his progress was slow and it was small and it was incremental, it was absolutely appropriate for his unique circumstances. I'm happy to answer questions about statute of limitations to the extent the court has any questions, but the record on appeal clearly demonstrates RS did not meet his burden to either exception applied. Importantly, there's no evidence in the record to show that any alleged misrepresentation made by Highland Park ISD or any alleged withholding of information by Highland Park ISD prevented his parents from requesting a due process hearing. And that is a required element when you look at the exception in the statute. Before looking at the Michael F factors, it's important for the court to understand the type of disabilities that RS has. He has an intellectual disability, a visual impairment, a speech impairment, an orthopedic impairment. He also qualifies as a student with other health impairment as well as a student with multiple disabilities. So this is not a student who is mainstreamed in the regular education classroom. This is the exact type of student that Andrew F addressed because he wasn't integrated in the regular classroom. So the question becomes, was his educational program reasonably calculated to enable RS to make progress appropriate in light of his circumstances? Highland Park ISD maintains it absolutely was. When you look at the first factor, whether the IEP was individualized on the basis of his assessment and performance, in our briefing we've cited you to multiple sites in the record showing that we relied on our evaluations. We relied on RS's present levels of academic achievement and functional performance. We based information based on the input of not only his parents but also his outside providers. And all of that information together is what Highland Park ISD based RS's goals and objectives on. And those goals and objectives were absolutely appropriate as seen by the progress he made both academically and non-academically, which I will get to. RS claims, however, that the opinion of Dr. Van Dyke essentially refutes that the IEP was individualized on the basis of assessment and performance. Neither the special education hearing officer or the district court below put much stock in Dr. Van Dyke's opinion. That's because when Dr. Van Dyke issued his opinion or gave his opinion and testified in the underlying due process hearing, he specifically said that he relied on information in the due process hearing request. Well, when you review the special education hearing officer's decision and you compare it to the allegations made in the request, you find that there's quite a dichotomy between what was actually alleged and what the hearing officer found to be true. But even more important, when you look at some of the things Dr. Van Dyke believed... What do you mean precisely by that? For instance, there are... We believe that RS's parents or the record shows that RS's parents had an exaggerated sense of what they believed was occurring. For instance, one of the allegations made in the complaint had to do with an accident, a bathroom accident RS had at school. And according to the due process hearing request, they stated that the district failed to notify RS's mother of the incident and they failed to address the toileting issue appropriately. And that's at record site 741. When RS's mother testified at the underlying due process hearing, she admitted that she was called, that she was unavailable, and then stated when he got home, RS had not been cleaned appropriately and his wheelchair had not been cleaned appropriately. And that's at 5950 of the record. But then when you look at the hearing officer's decision, he noted that the medicine that he was taking is what caused the bathroom accident, that the parents were notified. They asked if they wanted to pick him up. They declined to do so. The district cleaned RS, they cleaned the wheelchair, he saw the school nurse, and he received new clothes. And that's at 691 and 692 of the hearing officer's decision. So there's a complete dichotomy between what was alleged and what the hearing officer found. So when you look at Dr. Van Dyke's opinion, one of the things he said was that the ear flicking RS was demonstrating while at the district was the result of stress from HPISD, and he testified that RS's mother told him that she had to de-stress him every time he came home from school. When Dr. Van Dyke gave that opinion, he was under the impression that RS was still attending Highland Park ISD. He was under the impression that he was still coming home from school and that Highland Park ISD was the reason he was flicking his ear. He did not know at that time that RS had already been moved to his private placement, Chase's did not know that RS flicked his ears in Virginia, ultimately resulting in his testimony that he couldn't really trace this alleged stress to Highland Park ISD given that information. So when you look at the fact that Dr. Van Dyke based his opinion based on everything that the parents were telling him, it's easy to see why the hearing officer and the district court both disregarded it. With respect to the injuries, it's important, and Judge Jones has already pointed this out, that the injuries were all separate and they all were different with the exception of the two falls from the K-Bench. But what's also important for the court to note is that every time an injury happened, the district took some kind of step in order to address it. For instance, after he fell off the K-Bench in October of 2012, the district added another staff member to make sure the staff member was within arm's distance. In October 2013, he was in a standing frame and he fell forward and hit his head on the iPad when he was working with his assistive technology. There was really no steps to be taken at that point. But when he fell off the changing table in November of 2013, the principal investigated the incident, met with parents, followed up on the meeting with an email regarding the steps Highland Park ISD was going to take to ensure safety, including the institution of a hygiene protocol. That hygiene protocol was emailed to RS's parents, they added a belt to the changing table, and they made sure that there would be a staff member within reach. So this isn't a situation where we have a student who is sitting in a corner with severe disabilities who is not getting the attention that he needs from a school district. This is a situation where we have a school district pushing a student in light of his unique circumstances, putting in place an appropriate IEP to make sure that he is making progress under that IEP. When you look at the type of issues that RS has, one of those is he lacks core strength and he lacks muscle tone. In order for him to gain core strength and in order for him to gain muscle tone, one of the things they did was put him on the K-bench. When he's in the process of trying to sit up on the K-bench, he fell over once, or twice I should say. But this is no different than when you have a baby who's learning to sit up or a toddler who's learning to walk. In order for the toddler or the baby to learn that skill, you have to put them in the position for them to learn that skill. Sometimes in the process of doing so, there are accidents. But again, the district responded to those accidents by putting protocols in place to help lessen the chance of those occurring again. When you look at the second factor, which is whether the IEP was administered in the least restrictive environment, the record is clear that he absolutely had the appropriate amount of exposure to his general education peers in light of his disabilities. At his elementary school, he had lunch with his peers in the classroom. He had interactions with his general education peers in not only the classroom, but on field trips, on the playground, and during all school assemblies. When he moved to McCullough Intermediate School, he continued to have that interaction. As a matter of fact, he had two to three general education peers that would come into his math class each day, and they would do various activities with him. They would listen to music with him. They would accompany him to his activities outside of the classroom. He had P.E. for 30 minutes each day with his general education peers. He also had an assistive P.E. class where he also had general education peers in there assisting him with the P.E. And most importantly, he had a job at McCullough where he would deliver items such as mail to various classrooms. So he was getting to interact with general education peers throughout the day. This is exactly what this court looks to and wants to see when you have a student with his unique circumstances. There's also no question with respect to the third Michael F. factor, which is the coordination and collaboration. The most important fact that stands out when you look at the record is that the physical therapist alone had 145 documented interactions with R.S.'s parents, R.S.'s outside providers, and other school staff to show that not only was the district working with itself, but it was working with R.S.'s parents to make sure that they were implementing his IEP as it should be implemented. R.S.'s parents attended all of the ARD committee meetings. You're talking about 145 over what, two years, three years? Yes, over from May 2012 until approximately May of 2015. But that was just the physical therapist alone. But then you also look to the ARD committee meetings where R.S.'s parents attended the meetings with them to make sure that both parents could come to the ARD committee meetings, held them on different days, provided them with the draft IEPs and the draft goals. I was very impressed by the level of involvement of the parents here. They were present and accounted for. They absolutely were, and Highland Park ISD made sure that was the case because they provided them goals and objectives beforehand. They provided them the IEPs beforehand. They had monthly meetings where they would talk about what was going on with R.S. So these parents were involved, and the district made sure these parents were involved. So this is not a record where the school district shut the parents out and didn't take into consideration. And the fact that R.S.'s parents might have disagreed with the IEP or might have disagreed with goals and objectives, as the court has found in White v. Ascension Paris, disagreement over that does not rise to failing to collaborate and coordinate. With respect to the last Michael F. factor, which is whether he made academic and non-academic benefit, I simply want to highlight a few things for the court. When you look at his progress with respect to communication, in May of 2011, when he was in Virginia at Fairfax Public Schools, he was not making very much progress on his communication skills. After being in Highland Park... Well, he was a little kid. Correct. But one of the things they were working on in Virginia, for instance, was trying to help him use an augmentative assistive communication device so he would have a voice in order to communicate. And he wasn't making progress. But after being in Highland Park ISD and having his IEP implemented, he had progressed to using his AAC to answer yes and no questions, such as, do you want your glasses off, RS? He could also identify his name, his school, some basic needs, as well as make choices with his AAC device. When you look at his mobility, which is a big issue given his disabilities, when he was in Virginia, he was using a walker to propel himself through school. But the important part is that Virginia was locking the wheels on that walker. So RS was propelling himself in one direction and one direction only. When you move to Texas and to get to Highland Park after the district implements his IEP and is working on him and working on core strength and doing all of those things that he needs because of his circumstances, you see that he's now able to move his walker with some intent to steer or lean when he's trying to move. The wheels aren't locked. Not only that, he's making laps around the gym. So we've gone from propelling our walker with a locked wheel in one direction to making several laps around the gym, which requires him to go in circles. When you look at his circumstances and his disabilities, this is absolutely significant progress when you're looking at mobility. He also went from being able to bear weight on his legs for a couple of seconds to, after being in Highland Park ISD, bearing weight on his legs from 10 seconds to 2 minutes. He also made progress with respect to his fine motor skills. When he was in Virginia, he needed hand-over-hand support in order to activate cells on his AAC, which is how he would communicate. After being in Highland Park ISD for several years and having his IEP implemented there, he was actually able to activate his AAC by himself, putting his index and third finger together. Again, when you're looking at a student with the disabilities that RS has, this is absolutely significant progress because when you look at the testimony from Mr. Balzberger, who was with the Texas School for the Blind and Visually Impaired, his testimony is, with RS, you have to be in this progress for the long haul because it's going to come in incremental stages. It's going to be slow. So when RS says, well, any student could make this progress over a four-year period, RS isn't any student. He's unique. He has unique circumstances, and for him, this is absolutely significant progress. You can also see that with the academic progress he made while enrolled in Highland Park ISD. In Virginia, he was absolutely identifying numbers 1 through 17, but after having his IEP implemented in Texas, he was actually identifying numbers 1 through 10 from three choices. So he went from a 50% chance of getting it right to being able to identify numbers out of a 33% chance. He was also identifying the next number in a sequence. So he was essentially learning to count with 75% accuracy, and he actually upped his IEP goal to be able to match things out of three choices with an 80% mastery skill. He also started answering where questions with 63% accuracy, what questions with 69% accuracy, and who questions with 61% accuracy. So this is absolutely academic progress, particularly in light of RS's circumstances. The four Michael F. factors undoubtedly weigh in favor of the district and show RS received a FAPE. Because of that, the court never has to reach the question as to whether Chase's place was an appropriate placement for RS. Because, as you know, when you're looking at the private placement, you have to find that the public placement violated the IDEA, and the private school placement was proper under the IDEA. You don't get factor 1 because Highland Park ISD provided him with a FAPE, and you don't get factor 2 because Chase's place was absolutely inappropriate. RS wants to rely on Michael Z. Highland Park ISD doesn't believe Michael Z is appropriate here because Michael Z looks at the propriety of a student's unilateral placement at a residential facility, and that's not the case that we have here. RS was not put into a residential facility. So the question before the court under Florence v. Carter is, was his placement at Chase's place otherwise appropriate under the IDEA? Chase's place had a serious lack of providers. There was no physical therapist. There was no VI teacher, his visually impaired teacher. There was no orientation and mobility specialist. There was no AT specialist, assistive technology. There was no adaptive PE teacher. There was no music therapist. There was no one-on-one aid for RS. All of these things were things RS needed that were set forth in his IEP at Highland Park ISD. All of these things were services that Highland Park ISD not only could provide but was providing, and none of those were being provided by Chase's place. And because none of those were being provided by Chase's place, there was nothing that Chase's place was providing RS that Highland Park ISD could not otherwise provide. I wasn't able to find a Fifth Circuit case directly on point, but when you look at the Sixth Circuit's case in Berger v. Medina, it specifically says that private placement is not appropriate if it's not providing a student with something that the public placement can't otherwise provide. And the facts in Berger are similar to the facts here. There were some things that the private school placement wasn't providing the student, that the student needed under the IEP, and the Sixth Circuit said the private placement is not appropriate. Let me ask you, was there a finding here that private school Chase's place? Yes. Is there a record finding that that was not appropriate? Neither the hearing officer nor the district court have reached that question because they found that the district provided the student with a free appropriate public education, and so there was no reason to reach that. Okay, I was going to say because I didn't think I had seen that, and the answer is I didn't. Right, and that's the reason you have it is because nobody has reached that question. Highland Park ISD thinks that this court doesn't need to reach that question either, but if it did, Highland Park ISD maintains that it is not appropriate. For the reasons I've set forth and the reasons that we briefed, the court should affirm the district court's decision upholding the hearing officer's decision, finding Highland Park ISD provided the student with a free appropriate public education and complied with the IDEA. Okay, thank you very much. Mr. Whitburn. Before I address the issues that I was continuing with at the end of my presentation, before I'd like to address the issue of the lower court's, the hearing officer's and the lower court's disregard of Dr. Van Dyck's testimony. Dr. Van Dyck did not base his opinion on everything that was in the due process complaint. He makes that clear, and this is at record sites 24, 33 to 36, exactly what he's concerned about. What he accepted was the fact of the injuries that the plaintiff suffered. So what Dr. Van Dyck is concerned about is not these other issues that my colleague was describing in the due process complaint. What Dr. Van Dyck was concerned about is what would the effect be of a child with cortical visual impairment and cerebral palsy and these multiple disabilities falling over from a bench, from a chair, from these things. That's what he accepted of the due process complaint. He wasn't there to sort of see whether it happened or not. He was taking for granted that the due process complaint was correct that these injuries happened, and, in fact, it's undisputed that these injuries happened and these events happened. What was he doing when he met with plaintiff in October of 2015? What my colleague implies is that he was trying to do some sort of causal personal injury analysis and that it thus made a difference when he saw stress in plaintiff as to where plaintiff was going to school at that time. Dr. Van Dyck makes that clear on the record as well. He wasn't doing some sort of causal personal injury analysis. He wasn't looking at plaintiff's stress at the meeting to determine, well, where is that coming from? Is it coming from Highland Park Independent School District or somewhere else? It didn't make any difference to him where plaintiff was going to school at that moment because he knew where that stress was coming from. It was coming from him. What Dr. Van Dyck makes clear is that what he was trying to do in that meeting is evoke stress in plaintiff so that he could look and see what kind of stress reactions plaintiff had. He wasn't trying to say, well, oh, I see that he's stressed out right now, so it must be Highland Park Independent School District's fault. What he was doing as an expert of his caliber would do is look and see who he's dealing with and try to figure out, okay, exactly what unique characteristics and circumstances are we dealing with with this child? He has these kinds of stress reactions. That was what I would expect with somebody with cortical visual impairment, cerebral palsy, and the like. Okay, when you take a child like that, now that I've verified that, when you take a child like that, what effect would it have if that child falls over from a chair, from a bench, if these things did happen? And then he described the effects that those things would have. Now, in terms of the issue of the least restrictive environment that I was talking about when I closed before, another thing that Highland Park Independent School District didn't understand was how plaintiff exhibits stress. Dr. Van Dyke indicated in his testimony that it is absolutely clear, it's a heavily researched item, that when a child with these disabilities flaps his ears, that that is a sign of stress. Highland Park Independent School District didn't understand that. In the record, they indicate that they thought it was a sign of task avoidance or even happiness. They didn't realize it was a sign of stress at all. Well, what did they do on the basis of that? What happened is that when he actually was stressed, they thought he was happy or they thought he was avoiding tasks, so they took measures designed to combat that instead of realizing that they needed to prevent those stress levels from accumulating. When he actually was happy and when he was exhibiting signs that he wasn't stressed, that he was enjoying himself, they interpreted those as signs of stress. What should they have done? What would have been better? What would have been better? By the school district. They weren't reading his body language correctly. What should they have done? So in the first place, because it's a heavily researched item, because the school district is well aware of Dr. Van Dyck, is well aware of Texas School for the Blind and Visually Impaired, who relies a lot on Dr. Van Dyck's theories, they should have consulted with them to find out what do these signifiers mean. How do you tell whether a child is stressed? Well, didn't the parents try to transfer him there to the school for the blind? There was some interaction between the district and the school at the time, wasn't there? There was some interaction between the school district and Texas School for the Blind and Visually Impaired. At the time, when there was the first idea of a transfer, Texas School for the Blind and Visually Impaired declined to accept the transfer. But they did then send up some people to consult with the school district. That was around 2011, wasn't it? It was 2014 to 2015 is really when the – I think the first involvement of Texas School for the Blind and Visually Impaired was in 2014. I see that I'm running out of time, so I want to make one last point about Texas School for the Blind and Visually Impaired. And that is that you would think that when finally having the opportunity to consult with Texas School for the Blind and Visually Impaired, that the Highland Park Independent School District would act on their advice and would take the necessary measures. Okay, now we do have people that we can rely on to figure out how to do this better. Two things that the Texas School for the Blind and Visually Impaired did is that they kept asking, they kept saying, you've got to slow this down. You can't rush this kid. He's got delayed processing. But even at the end, in May of 2015, they were still going too fast. They were still – weren't reacting appropriately to the delay in processing. That's your first thing. What's the second? The second thing is that in – if you look at the brief of Apple Leaf, 36, page 36 of their brief, they cite a Texas School for the Blind and Visually Impaired article for the proposition that these injuries might actually have benefited plaintiff. They talk about this article as though it's somehow about plaintiff or relates to plaintiff. But no, this article is just an article about the blind in general. This is an article about the visually impaired in general, that you can't be sort of overprotective of them because if they happen to stumble into something, that, well, they might learn from it. That is not applicable to plaintiff. Plaintiff is not somebody who's sort of testing the waters, might accidentally put his hand in a bunch of goo and learn from that or something like that. This is a kid who's sitting on a bench and is completely unprepared for the trauma of falling off of it because nobody's near him. There's nothing educational or profitable from that experience. But that's how, in their own briefing, that's how Highland Park Independent School District shows that it is interpreting or deriving lessons from Texas School for the Blind and Visually Impaired. Oh, they're backing up what we've been doing all along. That's not what they were there to do. Thank you. We have your argument and we will take serious account of it. And the court will be in recess. Thank you very much.